51 CCPA

George E. HALL, Jr., Appellant,

v.

Louis B. TAYLOR, Appellee.

Patent Appeal No. 7158.

United States Court of Customs and Patent Appeals.

June 11, 1964.

Bernhard R. Swick, Wyandotte, Mich., for appellant.

Oscar L. Spencer, Pittsburgh, Pa., George R. Jones, Washington, D. C. (Mark Levin, Pittsburgh, Pa., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and AL-MOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of the subject matter of the five counts of interference No. 91,634 to the junior party Louis B. Taylor.

Taylor is involved in the interference on his application serial No. 9,440 filed February 19, 1960. George E. Hall, Jr., the senior party, is involved in the interference on his patent No. 2,919,222[1] issued on December 29, 1959, on application serial No. 467,021, filed November 5, 1954.

Taylor relies for priority on an earlier filed application serial No. 393,522, filed November 20, 1953, of which 9,440 is a continuation-in-part. Since neither party took testimony and both parties rely only on their filing dates, the sole issue is whether Taylor's 1953 application supports the counts.[2]

The invention relates to paper making and particularly to a process wherein pulp slurry called "furnish," pretreated with calcium silicate pigment as filler, is sheeted into paper web on the wire screens of a paper-making machine. The essence of the invention is using a particular kind of calcium silicate while maintaining the slurry within a specific pH range.

Counts 1 and 2 are representative:

"1. In a process for the manufacture of paper, wherein a furnish is prepared, the step which comprises adding to said furnish a hydrated calcium silicate pigment having an $SiO_2/CaO$ mol ratio limited by a maximum value of about 5:1 and a bound water content limited by a maximum value of about 10% by weight of said pigment and adjusting the pH to a value within the range of about 4.5–6.5.

"2. A process according to claim 1 wherein the bound water content of said pigment added to said fur-

nish is about 3.5% by weight of said pigment."

Counts 3 and 4, analogous to counts 1 and 2, respectively, claim the *paper furnish* per se. Count 5 claims *paper product* made with the furnish defined in count 3.

The board describes the invention thus:

"Papers produced from furnish containing hydrated calcium silicate filler are characterized by a high opacity, good whiteness or brightness and a desirable increase in bulk. The drawback to certain of these calcium silicate fillers lies in their alkalinity. Usually the pH of the furnish is adjusted [before adding calcium silicate] to between 4.5 and 6.5 [by adding alum] to produce a web of the desired strength. * * * but the alkalinity of certain calcium silicates requires additional alum or other neutralizing agent to reset the pH after the addition of the calcium silicate filler. * * *

"The invention, corresponding to the subject matter of the counts, is based on the discovery by Hall that if a calcium silicate pigment having an $SiO_2/CaO$ mol ratio not greater than 5:1 and a bound water content (chemically bound water or water of hydration) of not more than 10 weight per cent based on the weight of the pigment, is employed as a filler in a paper furnish, the quantity of alum or other neutralizing agent required to adjust pH of the paper furnish is substantially reduced. * * *"

1. Its five claims were copied by Taylor in the latter's application serial No. 9,440 to provoke this interference.

2. Both parties argue the merits of whether or not Taylor's *1960* application supports the counts. Both the examiner, in a decision on motion, and the board held it does. We consider such issue to be here irrelevant since, as correctly noted by the board, "In order for Taylor to prevail in this proceeding, he must

show that the counts read on his *parent* application * * *." (Emphasis ours.) Further, the board earlier in its opinion said, "this parent application of Taylor was the very basis for the declaration of the instant interference * * *. If this were not the case, the Taylor involved application [filed in 1960] would have been rejected on the Hall patent since the effective date of the latter is *prior* to the filing date of the involved Taylor application."

The board held, one member dissenting, that Taylor's parent application supported the counts since they "read on the parent application," notwithstanding the primary examiner's earlier ruling to the contrary.[3]

We first consider Taylor's parent application. It says (all emphasis ours):

"This invention relates to a pigment-filled paper and method of producing the same.

\*    \*    \*    \*    \*    \*

"According to this invention it has been found that paper of high brightness, opacity, and smoothness may be prepared by adding a finely divided hydrated amorphous calcium silicate or other alkaline earth metal silicate to a slurry of wood pulp which is maintained at a *pH in the range of 4 to 9.2* \* \* \*.

"An amorphous hydrated calcium silicate having an average ultimate particle size less than 0.1 micron, a *bound water content of about 3 to about 15 per cent by weight,* and a free water content of about 4 or 5 per cent by weight has been found to be particularly suitable for use in the present invention. \* \* \* Best results are obtained when the *mole ratio of $SiO_2$ to $CaO$* in the calcium silicate is *preferably in the range 2:1 to 4:1.* However, other silicates in which this ratio is as low as 1:1 may be used."

The application further states that it is desirable to process certain woods in acid medium (pH less than 7).

The board in comparing the count limitations with Taylor's parent application disclosure said:

"The first limitation in said counts is that the hydrated calcium silicate must have an $SiO_2/CaO$ mol ratio 'limited by a maximum value of about 5:1.' \* \* \* [Taylor's parent application discloses] an $SiO_2/CaO$ ratio of 2:1 to 4:1 \* \*. Further, a specific silicate having a 3.3:1 ratio is shown \* \* \*. These values are below the maximum of 5:1 in the counts and hence we hold that the first limitation reads on the counts. [We assume the board meant the first limitation of the counts reads on the parent application disclosure.]

"The second limitation is that said hydrated calcium silicate must have a 'bound water content limited by a maximum value of about 10% by weight of said pigment.' In \* \* \* the parent Taylor application, \* \* \* a bound water content of 3 to about 15 per cent by weight is disclosed (in hydrated calcium silicate). Although that part of the range above 10% does not read on the counts, we hold that the counts read on the disclosed part of the range below 10%. Furthermore, the parent case disclosure of 3–15% is manifestly a specific disclosure of 3%, which clearly reads on the counts, and this is sufficient support for priority purposes. \* \* [We assume here the board meant the counts read on the disclosure of from 3% to something below 10% though the disclosure goes to 15%.]

"The third limitation is that the pH of the paper furnish must be adjusted within the range of about 4.5–6.5, i. e. after the addition of the calcium silicate. \* \* \* [The] parent Taylor application \* \* \* [teaches] that the pH of the pulp slurry should be at least 4 but not above 9.2. This broad range encompasses the narrow range of 4.5 to 6.5 in the counts and we therefore hold that the counts read on the parent Taylor application. Wemple et al. v. P[ei]rce et al., 22 CCPA 1064,

---

3. Taylor filed a motion under Rule 235 to shift the burden of proof to Hall on grounds that Taylor's parent application supports the counts. The motion was denied, the examiner holding that the parent Taylor application disclosed no "embodiment" setting forth the parameters of the counts and thus did not support the counts.

1935 CD 428, 75 F.2d 998, 25 USPQ 37 and Becket v. Arness, 27 CCPA 1251, 1940 CD 589, 112 F.2d 1011, 46 USPQ 48. In both cases cited, the Court of Customs and Patent Appeals found support for the narrower ranges of the counts in the broader encompassing ranges in the applications in question. In the latter cases, the Court recognized no criticality in the narrower ranges of the count, it is noted.

"Similarly, *we find no criticality* in the three range limitations expressed in counts 1, 3 and 5." [Emphasis ours.]

The board further pointed out with regard to the claimed pH range that Hall's patent says in one example "an acid pH" is desired, from which the board concluded that the precise range of the count, 4.5–6.5, is not "critical."

As to counts 2 and 4 the board said:

"Taylor contends * * * that the disclosure of 'bound water content of about 3 to about 15 per cent by weight' on pages 1 and 2 of his parent application * * * is a disclosure of a hydrated calcium silicate having a bound water of about 3 per cent by weight. We agree with this contention. Taylor next contends that disclosures of 'about 3' and 'about 3.5' are insignificantly different and that therefore 'about 3 per cent by weight' in the parent Taylor application corresponds to the limitation 'about 3.5 per cent by weight' in the count. Taylor urges * * * that 'this is particularly true in view of the meaning which must be placed upon "about 3.5%" set forth in counts 2 and 4.' The following statement is referred to by Taylor and appears in * * * the Hall patent:

"'As the bound water is further reduced, less reduction in the alum is noted until at or about 3.5% bound water content a maximum reduction of the alum requirement is reached. In fact,

below about 5% bound water (or above a calcining temperature of 500°C.) very little reduction in alum requirement is noted.'

"In view of this statement, it is obvious to us that the limitation of 'about 3.5%' bound water is not critical * * * and therefore it is our opinion that the expression 'about 3.5%' in the counts reads on a hydrated calcium silicate having about 3 per cent bound water which, as we have held supra, is disclosed in the parent Taylor application."

Appellant argues that "Although the parent application [of Taylor] contains disclosures of a scope which embraces the specific compositions recited by the claims in issue as well as a large number of other compositions, if a clear basis for the specific compositions set forth in the interference counts cannot be found in the broad and comprehensive disclosure of the parent application, the filing date of the parent application cannot be relied on"; that "the broad range set forth in * * * [Taylor's parent] application overlaps one end of the counts [and] does not make it a disclosure of the limitations of the counts where the application *fails to teach the gist of the invention*" (emphasis ours); that the gist of the invention defined by the counts is the "*combination* of limitations" nowhere found in an embodiment in Taylor's parent application; and that "one skilled in the art would not be taught the invention defined by these five counts by the disclosure in the Taylor [parent] application and that, therefore, Taylor has no right to make the * * * counts * * *."

Further appellant challenges the board's reliance on this court's decision in Den Beste v. Martin, 252 F.2d 302, 45 CCPA 798, for the proposition "In order for Taylor to prevail in this proceeding, he must show that the counts read on his parent application; he is not required to show that the counts would have been patentable to him in the parent case."

848

■ Notwithstanding appellant's arguments, we find no reversible error in the board's decision. We have considered the precedents cited by appellant, particularly Prutton v. Fuller and Johnson, 230 F.2d 459, 43 CCPA 831, and In re Draeger and Shewell, 150 F.2d 572, 32 CCPA 1217. We find in the Draeger opinion what we consider the key to determining whether a disclosure supports a claim for interference purposes—the key which appellant himself recognizes—viz., does the disclosure *teach the gist of the invention* defined by the claim? While we realize that all limitations of a claim must be considered in deciding what invention is defined, it is futile merely to compare *quantitatively* range limits and numbers set out in counts with range limits and numbers disclosed in an allegedly supporting specification. Closer scrutiny is required to get at the essence of what invention the count purports to define.

In the Draeger opinion, after considering all the facts, this court concluded:

"Appellants' application as filed *fails to teach the gist of the invention* here involved, and they should not now be permitted, on said disclosure, to extract from an issued patent, claims obviously based upon the disclosure of a critical element *not even hinted at in their specification.*
\* \* \*

\* \* \* \* \* \*

"In the instant case \* \* \* the ranges in the appealed claims are so different from the ranges disclosed

by appellants that it is obvious that *the inventions are different.*" [Emphasis ours.]

■ Applying a similar rationale to the instant case, we think the Taylor parent application teaches the "gist of the invention" defined by the counts. Appellant asserts "criticality" in the *combination* of three parameters specifically recited in the counts. However, we, as did the board, have searched the record in vain to find it and we agree with the board that "Hall refers to these limitations as critical without showing exactly how they are critical." Assuming, arguendo, that the process practiced as claimed in the counts is optimum, we do not consider the ranges of the parameters disclosed in Taylor's parent application *so broad* and the ranges recited in the counts *so narrow* that the *counts define a different invention.* We therefore hold that Taylor's parent application supports the counts.

■ Prior to printing the record appellant moved to strike portions requested by Taylor, including the complete contents of the file wrapper of Hall's application serial No. 467,021 and several papers filed by Taylor before the Board of Interferences. We denied the motion subject to taxing printing costs for such portion at the time of final decision. We find that such portion was unnecessarily included in the printed record. The cost of printing thereof accordingly is assessed against appellee.

The decision of the board is affirmed.

Affirmed.