The PERKIN–ELMER CORPORATION, Appellant,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Appellee.

Appeal No. 86–646.

United States Court of Appeals, Federal Circuit.

June 24, 1987.

Francis T. Carr, Kenyon & Kenyon, New York City, for appellant. With him on brief were John C. Altmiller, Michael J. Lennon and Steven Anzalone.

Robert E. Isner, Nims, Howes, Collison & Isner, New York City, for appellee. With him on brief were William R. Hansen and Margaret Ranft. Also on brief was

Walter G. Sutcliff, Westinghouse Elec. Corp., of Pittsburgh, Pa.

Before MARKEY, Chief Judge, NEWMAN and ARCHER, Circuit Judges.

MARKEY, Chief Judge.

Appeal from a judgment of the United States District Court for the Eastern District of New York. The district court found that Westinghouse's accused devices do not infringe claim 1 under the doctrine of equivalents. Unable to view that finding as clearly erroneous under Fed.R.Civ.P. 52(a), we affirm.

## I.

Perkin-Elmer sued Westinghouse for infringing its U.S. Patent No. 3,873,884 (the '884 patent) on an invention of Fred C. Gabriel (Gabriel), entitled "Electrodeless Discharge Lamp and Power Coupler Therefor". A nonjury trial on the issues of patent infringement and validity was held on August 6–10, 1979.

Before the district court, Perkin-Elmer conceded the absence of literal infringement, but alleged infringement under the doctrine of equivalents. Westinghouse conceded that the '884 patent, if narrowly construed, is valid. As noted by the district court, if the claim is to be "construed broadly as claimed by Perkin-Elmer, Westinghouse argue[d] that the patent is invalid for lack of specificity, lack of novelty, and obviousness." Saying the patent is valid "if interpreted narrowly," the district court upheld the validity of the '884 patent and found that Westinghouse did not infringe under the doctrine of equivalents.

Perkin-Elmer appeals from the district court's holding of non-infringement under the doctrine of equivalents. Westinghouse did not appeal from the district court's validity holding.

## II.

The sole issue is whether the district court's finding, that the accused devices do not infringe claim 1 of the '884 patent under the doctrine of equivalents, is clearly erroneous.[1]

## III.

The claimed invention is a resonator coupler for an electrodeless discharge lamp (EDL).

EDL's have a trace of a selected element incorporated in them to provide a bright spectral line source of the selected metal for use in chemical analysis, particularly atomic absorption spectroscopy (AAS). AAS is performed by comparing the intensity of the EDL-generated spectral line, after it has passed through a test sample which has been atomized in a flame or other atom cell, to a previously measured and stored intensity of the EDL-generated spectral line after it has passed through a sample of a known concentration which has been similarly atomized. Although EDL's were known spectral line sources, they were of limited use due to their high cost, large size, unreliable operation, and undesirable electromagnetic problems.

Gabriel claimed his invention in very specific terms. The only independent claim in issue, claim 1, reads:

(a)[2] A resonator coupler for coupling a source of r-f electrical power into an electrodeless discharge lamp for starting and operating the lamp comprising:

(b) a grounded hollow cylinder of electrically conductive material open at one end, with a grounded base member at the other end;

(c) a helically coiled wire conductor concentrically within the cylinder and spaced from the inner walls thereof;

(d) means for mounting a discharge lamp substantially concentrically within one end position of the coil;

---

1. That Westinghouse purchased and studied a patented lamp of Perkin-Elmer and then designed its own is of no moment if its design does not constitute infringement.

2. Lettering of claim 1 was added by district court, which we continue for convenience.

(e) the wire of the coil being one quarter wave long relative to the free-space wavelength of r-f power intended to be applied for operating a lamp mounted therein;

(f) the end of the coil at the end portion within which a lamp is adapted to be mounted being toward said base and being grounded, the other end of the coil being open circuited; and

(g) electrical connecting means for connecting to the coil a source of r-f electrical power that is sufficient to maintain a discharge in a lamp mounted within the coil,

(h) *said connecting means being tapped into the coil at a point near, but spaced from, the grounded end thereof,*

(i) *said point being selected such that, when a lamp mounted in the coil is in operation by r-f power connected to the coil, the coupler is tuned to the frequency of said r-f power and the impedance of said lamp and coupling means at said tap point substantially matches the impedance of said r-f power source,*

(j) whereby when said r-f power is applied to the coil, and before a discharge is ignited in the lamp, a voltage maximum occurs at the open circuited end of the coil and creates a potential extending through the lamp portion between said open circuited end and said base member for ionizing the gas in the lamp. [Emphasis added.]

The parties disputed the meaning of several clauses in the claim. The district court did not expressly construe claim 1; it clung to the literal language of the claim and found four fundamental differences between the claimed invention and the accused products of Westinghouse. Because of those differences, the district court found that the accused devices do not perform substantially the same function in substantially the same way to obtain the same result.

It is unnecessary for this court in this case to ascertain the interpretation the district court gave to the disputed clauses in the claim, from a review of the differences it found in those clauses or otherwise.[3] If that were done, and if we were then to conclude that the district court's construction of the claim was legal error, we would remand to the district court for an application of the properly construed claim to Westinghouse's devices.[4] Because of the differences found by the district court between the accused devices and the structure and operation set forth in claim clauses (h) and (i), the interpretation of which is *undisputed,* and because those differences sufficiently support the district court's determination of non-infringement under the doctrine of equivalents, a remand is not necessary and an affirmance is in order.[5]

---

**3.** Nor is it necessary to discuss the portion of the district court's opinion devoted to the prosecution history. The detailed claims were allowed in the first Office Action. Whether the district court's discussion of the prosecution history may have been too succinct is irrelevant when, as here, its determination of non-equivalence between the accused devices and the claimed invention is not clearly erroneous. Perkin-Elmer's argument respecting prosecution history estoppel disregards the effect of attorney argument and the basic requirement that claims be drawn to that which the inventor considers his invention, 35 U.S.C. § 112, and to avoid the prior art. In response to a rejection, for example, Gabriel's attorney said:

All applicant's *claims define the structure by which his desired mode of operation is achieved* and which *distinguishes over the prior art* exemplified by the foregoing Booth *et al* patent. Specifically, for example, applicant's claims specify that his coil has one end "open circuited" and that means connecting the coil to the rf source is tapped into the coil at "a point near, but spaced from, the grounded end thereof" (claims 1 to 10 or "intermediate the ends thereof" (claims 11 and 12)). [Emphasis added.]

**4.** Validity of the properly construed claim would be a potential issue on such a remand.

**5.** In *SRI International v. Matsushita Electric Corp.,* 775 F.2d 1107, 227 USPQ 577 (Fed.Cir. 1985) (in banc), this court reversed a grant of summary judgment because of the presence of genuine issues of material fact relating to the reverse doctrine of equivalents. The present case arises after a full trial on the application of the doctrine of equivalents. Whether differences were correctly found by the district court between the accused devices and other claim clauses is irrelevant where, as here, the differences in clauses (h) and (i) are such as to cause the accused devices to operate as wholes in a way not substantially the same as that in which the claimed devices operate as wholes.

As often occurs, the record contains some evidence on which this court might, if sitting at trial, have found the facts differently. That is not, however, our role. When, as here, the district court has found the fact of non-equivalence and there is evidence to support that finding, we are not at liberty to reverse unless we can say that that finding was clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous."). In sum, a determination of non-equivalence is a finding of fact and we cannot say that that finding in this case was clearly erroneous.

### Tap Coupling vs. Loop Coupling

The differences based on claim clauses (h) and (i) are for ease of reference denoted by the parties and the district court as tap coupling in the claimed invention and loop coupling in Westinghouse's two devices.

The patent discloses and claims in clauses (h) and (i) an autotransformer-type tap coupling with a tap point variably located on the helical coil for connecting it to the r–f power source. To obtain a high voltage within the EDL, the location of the tap point is selected to tune the resonant frequency of the EDL to the frequency of the r–f power source. And to maximize power transferred from the r–f source to the EDL, the location of the tap point is set to match the internal impedance of the EDL with the impedance of the r–f power source. The patent specification, describing the single embodiment in the drawing and specifically set out in the claim, makes clear that the tap was located on the coil to perform a particular function:

The tap 26 into the coil 15 is located relative to the turns of the coil so that

when the lamp 10 is operating the coupler 11 is tuned to the frequency supplied by the r–f generator and the impedance of the coupler and lamp circuit matches the impedance of the r–f generator at the tap 26.

The district court found that the tap point and its positioning for purposes of frequency tuning and impedance matching, as claimed, is one of the "cardinal structural-functional-operational interrelationships" of the claimed invention. Perkin-Elmer does not challenge that critical finding.

Perkin-Elmer concedes that Westinghouse's devices employ a transformer-type loop coupling (as distinguished from an autotransformer-type tap coupling) in which the connecting point between the helical coil and the r–f power source is not fixed for purposes of frequency tuning or impedance matching. Perkin-Elmer also concedes that the claimed invention's autotransformer-type tap-coupling arrangement is different from Westinghouse's transformer-type loop-coupling arrangement. In the claimed invention, a portion of the secondary coil in the autotransformer circuit serves as a primary coil in that circuit, whereas, in the accused devices, the primary and secondary coils in the transformer circuit are separate.

Perkin-Elmer's candid concession of the aforementioned differences between the claimed invention and the accused devices is mandated by the record before us and there is no plausible basis for setting aside the findings on those differences as clearly erroneous. However, the critical question here is whether the differences in coupling establish that the claimed invention and the accused devices do not operate in substantially the same way.[6] If that question is answered in the affirmative, the district court's finding that the accused de-

---

**6.** Perkin-Elmer's repeated assertions that the claimed and accused devices perform substantially the same function and achieve substantially the same end result are not helpful. That circumstance is commonplace when the devices are sold in competition. That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950); *see, e.g., Sealed Air Corp. v. U.S. International Trade Comm'n*, 645 F.2d 976, 984, 209 USPQ 469, 476 (CCPA 1981).

vices do not infringe claim 1 under the doctrine of equivalents cannot be found to have been clearly erroneous.

### Perkin-Elmer's Arguments

Perkin-Elmer argues that: (1) the claimed invention should be considered as comprised of only two elements, an EDL and a helical resonator, saying that the claimed invention is "more of a pioneering invention than merely an improvement" and is thus entitled to a broad range of equivalents, citing commercial success and industry impact; (2) the accused devices and the claimed invention are based on the same "concept"; and (3) tap and loop coupling were known by those with ordinary skill in the art to be interchangeable for power transfer in other devices.

### (1) Two-element Combination

■ A pioneer invention is entitled to a broad range of equivalents. *Sealed Air Corp. v. United States International Trade Comm'n*, 645 F.2d 976, 984, 209 USPQ 469, 477 (CCPA 1981). However, the district court's view that Perkin-Elmer's claimed invention devoted to the provision of light for AAS is not a pioneer invention is supported by the presence in the record of prior art devices, including EDL's, also devoted to provision of light for AAS. As specifically stated in the patent and undisputed on this record, the claimed invention constitutes an *improved* means for providing such light. Perkin-Elmer's statement in its brief that the invention is "more in the nature of a pioneer patent [sic, invention] than a mere improvement" cannot substitute for evidence establishing that the invention was a pioneer. That an improvement enjoys commercial success and has some industry impact, as many do, cannot compel a finding that an improvement falls within the pioneer category.

Perkin-Elmer bases its "pioneer" argument on its repeated characterization of the claimed invention as a two-element combination of a known helical resonator with a known EDL.[7] That characterization oversimplifies and disregards the specific language deliberately selected by Gabriel in claiming the subject matter he regarded as his invention. That Gabriel may have drawn knowledge from the helical resonator art is irrelevant, for the disclosure and claims of the '884 patent are drawn to explicit structure and relationships having specific functions in EDL operation.

One must start with the claim, and, though a "non-pioneer" invention may be entitled to some range of equivalents, a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement. Nor, as Perkin-Elmer here requests, should a court convert a multi-limitation claim to one of two limitations to support a finding of equivalency. If Gabriel regarded his invention to have been as Perkin-Elmer now describes it, he should have at least referred to a helical resonator in his disclosure and either so claimed it or sought broadened claims by reissue. Though the doctrine of equivalents is designed to do equity, and to relieve an inventor from a semantic strait jacket when equity requires, it is not designed to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 610, 70 S.Ct. 854, 857, 94 L.Ed. 1097, 85 USPQ 328, 331 (1950); *Carmen Industries v. Wahl*, 724 F.2d 932, 942, 220 USPQ 481, 488 (Fed.Cir.1983) (doctrine applies when there is a "minor modification").

■ In *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1364, 219 USPQ 473, 482 (Fed.Cir.1983), this court noted that it was legal error not to "apply the doctrine

---

**7.** The words "helical resonator" appear nowhere in the patent and Gabriel's invention is described nowhere in the prosecution history as incorporating a helical resonator. Gabriel specifically described and specifically claimed in detail a single embodiment of a particular resonator coupler, with each of its structural elements, relationships, and functions expressed in the claim. Nothing in the patent provides support for expanding the scope of that claim.

of equivalents to the claimed invention as a whole." That statement dealt with an infringement inquiry implicating an entire claim, as distinguished from a section 112 ¶ 6 inquiry implicating only a "means plus function" limitation of a claim. That statement also was a recognition that, in applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim. The statement should not be interpreted as sanctioning the treatment of claim limitations as insignificant or immaterial in determining infringement.[8] "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 USPQ 524, 533 (Fed.Cir.1985).[9] To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

Perkin-Elmer's repeated insistence on interpreting claim 1 as though it read "In combination, an EDL and a helical resonator" is accompanied by no explanation of why the invention was never so claimed. The major portion of its brief is devoted to a review of the prior art in an effort to indicate that such a claim might have been allowed. Because it was never submitted, we are left only with conjecture on what the examiner's reaction might have been and what prior art might have been cited against such a claim.

Moreover, the accused devices were on the market for a year when Perkin-Elmer filed for "reissue" under 37 C.F.R. § 1.175(a)(4)(1977). Westinghouse participated actively in that proceeding, during which Perkin-Elmer succeeded in establishing that claim 1, *as presently written*, distinguished over numerous additional prior art references. Thus, with knowledge of the accused devices, Perkin-Elmer at no time elected to submit its two-limitation claim to PTO examination.[10]

Throughout its briefs, Perkin-Elmer tells us often that Westinghouse as protester said that Gabriel's invention was just an old EDL and an old helical resonator. Doubtless, as protestors will, Westing-

---

**8.** In determining priority of invention, consideration of the "gist" or "essence" of the invention may be appropriate. *See, e.g., Stansbury v. Bond*, 482 F.2d 968, 974, 179 USPQ 88, 92 (CCPA 1973); *McCutchen v. Oliver*, 367 F.2d 609, 611, 151 USPQ 387, 389–92 (CCPA 1966); *Hall v. Taylor*, 332 F.2d 844, 848, 141 USPQ 821, 824 (CCPA 1964). We are aware of dicta that state consideration of the "essence", "gist", or "heart" of the invention may be helpful in determining infringement under the doctrine of equivalents. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 228 USPQ 90 (Fed.Cir.1985); *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1582, 224 USPQ 409, 418 (Fed.Cir.1984) (both citing *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567, 220 USPQ 97, 101 (Fed.Cir. 1983). That dicta may not be read as implying that specific claim limitations can be ignored as insignificant or immaterial in determining infringement. It must be read as shorthand for the considerations set forth in *Graver Tank*, i.e., that the infringer should not appropriate the invention by making substitutions for those limitations, when the substitutions do not substantially change the function performed, or the way it is performed, by the invention.

**9.** References to "elements" can be misleading. "Elements" often is used to refer to structural parts of the accused device or of a device em-

bodying the invention. "Elements" is also used in the phrase "[a]n element of a claim" in 35 U.S.C. § 112 ¶ 6. An element of an embodiment of the invention may be set forth in the claim (*e.g.,* "said connecting means" in clause (h) of the present claim). It is the *limitation* of a claim that counts in determining both validity and infringement, and a limitation may include descriptive terms (*e.g.,* "tapped into the coil at a point near, but spaced from, the grounded end thereof" in clause (h)). Because claims are composed of a number of limitations, the limitations have on occasion been referred to as "claim elements" or "elements of the claim," but clarity is advanced when sufficient wording is employed to indicate when "elements" is intended to mean a component of an accused device or of an embodiment of an invention and when it is intended to mean a feature set forth in or as a limitation in a claim.

**10.** Perkin-Elmer filed its (a)(4) "reissue" proceeding two years and five months after the '884 patent issued. To submit its broadened two-limitation claim it would have had to have filed for reissue within two years of the patent's issue date. 35 U.S.C. § 251.

house sought to broaden the claim to the point of invalidity. Perkin-Elmer's effort to cite Westinghouse's protest-inspired characterization as authority or evidence is twice flawed: (1) it lacks any statement of what Perkin-Elmer said to the PTO in response; and (2) it fails to realize that the examiner did not accept Westinghouse's characterization but simply found the detailed claims as written not unpatentable over the art.

Here, as above indicated, the district court correctly rejected Perkin-Elmer's two-element characterization of the claimed invention. The district court properly viewed the entire claim, including clauses (h) and (i), and found that the accused devices did not operate in substantially the same way as did the claimed invention. Perkin-Elmer's attempt at minimizing the importance of clauses (h) and (i) cannot establish clear error in the district court's findings 53 and 54:

> 53. Apart from the absence of the tap point, the impedance of the Westinghouse power coupler at the point of r–f connection does not substantially match the impedance of the r–f source. In Westinghouse couplers, there is an impedance mismatch and the coaxial cable between the coupler connection and the r–f source is an integral element used for impedance matching the remote r–f source to the system. Such coxial cable must be of a specific length to cancel out the inductance provided by the transformer coupling loop which presents an additional inductive reactance not present in the circuit described and claimed in the Gabriel patent.
>
> 54. The Westinghouse power couplers are not tuned by anything relating to the internal r–f power coupling means. Dr. Nahemow pointed out that the tuning of the Westinghouse power coupler is done by adjusting the length of the coaxial cable between the connecting means and the r–f power source and by positioning the iris capacitor. [Citations omitted.]

### (2) Concept

In attempting to denigrate the significance of the differences between tap-cou-

pling and loop-coupling in this case, Perkin-Elmer says both methods use transformer "concepts" to transfer power to an EDL. Again, as occurs throughout its brief, Perkin-Elmer improperly generalizes the claimed invention. The claim is not drawn, as no claim may be, to a "concept", and is not directed merely to power transfer. The claimed tap coupling accomplishes much more than merely transferring power. As the district court found, tap-coupling enables the claimed invention to implement a specific *manner* or *way* of impedance matching and frequency tuning. That manner of operation is based on a positioning of the tap point location along the length of the helical coil, and is, as Perkin-Elmer concedes and the district court stated *supra*, one of the "cardinal structural-functional-operational interrelationships" of the claimed invention.

In contrast, there is no such tap point in Westinghouse's devices, for impedance matching, for frequency tuning, or for any purpose.

There is on the contrary, as the district court found, a frequency mismatch in the Westinghouse devices which is remedied by varying the length of an external cable (not an element in the claimed invention) connecting the EDLs to their r–f power source and by the positioning of an "iris capacitor"; that is, the Westinghouse devices are not tuned by anything relating to the internal r–f power coupling means and are tuned in a substantially different way from that required by the claim. Perkin-Elmer does not challenge the district court's findings of those structural and functional differences.

The impedance of Westinghouse's devices at the point of r–f connection does not substantially match the impedance of the r–f source. Rather, there is, in addition to the above-described frequency mismatch, an impedance mismatch. That mismatch is in part caused by an additional inductive reactance (impedance) generated by Westinghouse's use of loop coupling. Those facts are undisputed.

The district court found that, to compensate for that impedance mismatch, the external cable connecting Westinghouse's EDLs to their r–f power source must be of a specific length, and is an "integral element used for impedance matching." Perkin-Elmer's response to that finding is to argue that the invention and the accused devices all match impedance. That argument misses the mark, for it disregards the *way* impedance is matched in its claimed invention and the different way impedance is matched in the accused devices.

Perkin-Elmer says an impedance match could be achieved in the accused devices by varying the number of turns in the primary coil of their transformer circuit, that primary coil being the portion of helical coil between the fixed tap-point at one end and the ground connection. Assuming, *arguendo*, that that were true, we fail to detect the relevance of a modified version of the accused devices, even if Perkin-Elmer had pointed, as it did not, to evidence that the modified version would operate substantially the same as the claimed invention. That a hypothetical modification of the accused devices might make them more nearly equivalents of the claimed invention argues against a finding of infringement by the actual accused devices under the doctrine of equivalents.

### (3) Interchangeability

■ That persons skilled in the art would have known of the interchangeability of claimed with unclaimed elements is a factor in considering equivalence, *Graver Tank & Mfg. Co.*, 339 U.S. at 609, 70 S.Ct. at 856, 85 USPQ at 331; *see Thomas & Betts Corp.*, 720 F.2d at 1579, 220 USPQ at 6, yet the accused devices must still perform substantially the same function in substantially the same way to obtain the same result. The present record is replete with evidence directly establishing the substantially different ways in which the claimed resonator coupling and the accused devices operate. The district court's findings on that evidence are for the most part unchallenged. To the extent Perkin-Elmer does challenge the district court's findings on the operational differences of the cou-

pling arrangements, those challenges are vague, ambiguous, and incomplete. For example, Perkin-Elmer's evidence that tap-coupling and loop-coupling were known to be interchangeably useful in effecting power transfer in entirely different and unrelated environments cannot serve as a basis for enlarging the subject matter explicitly set forth in the claim. Moreover, that evidence is nonprobative of equivalence when one notes that the coupling structure of the claimed invention does more than merely transfer power. As above indicated, the claimed tap coupling also assumes a critical role in matching impedance and tuning frequency, functions achieved in an entirely different way in the accused devices. Perkin-Elmer points to no evidence that tap and loop couplings were known as interchangeable means for performing those functions.

■ That the functions of impedance matching and frequency tuning are not performed in substantially the same way establishes in this case that the accused devices do not wholly operate in substantially the same way as the claimed invention in providing light for AAS. Though the claimed invention and the accused devices provide light for AAS, the specific coupling structure and method specifically claimed permeates the entire operation of the claimed invention and cannot be deemed insignificant or insubstantial.

### Conclusion

The district court's finding that the accused devices and the claimed invention do not operate in substantially the same way cannot be said to have been clearly erroneous. Accordingly, the judgment appealed from is affirmed.

AFFIRMED.

PAULINE NEWMAN, Circuit Judge, dissenting.

The district court did not follow this court's precedent in deciding the question of infringement. Nor does the majority, which has, in addition, undertaken to re-

write this precedent. Thus I respectfully dissent.

Questions of patent infringement turn on the application of a legal document, in the form of patent claims, to technology, as embodied in an accused device. Perkin-Elmer and Westinghouse both presented extensive evidence on the technology. The testimony of opposing technical experts was refreshingly harmonious; perhaps because these principles of classical electricity are beyond debate. The majority has, curiously, created substantive technological differences where there are none, adopting an incorrect view of the invention and a misapplication of the law.

Perkin-Elmer asserted, and reaffirmed in response to a question from the bench, that its position was not that it had made a two-element combination such that all other claim limitations should be ignored. Undoubtedly a basic contribution of the invention is the use of a helical resonator to ignite and power an electrodeless discharge lamp, but Perkin-Elmer has never argued that the other limitations in the claims are irrelevant. To the contrary, Perkin-Elmer has argued that the various claim limitations are part of its claimed invention and appear in the accused devices. Perkin-Elmer has not asked the court to "erase a plethora of meaningful structural and functional limitations", as the majority states. The emphasis on Perkin-Elmer's "two-limitation claim", and significant portions of the technological discussion, are creations of the majority, not Perkin-Elmer.

The majority has found non-equivalence between the known transformer used by Westinghouse and the known transformer of the '884 claims, although the references of record teach both with helical resonators. Unless the doctrine of equivalents is to be eliminated as an equitable tool of infringement analysis, these simple electrical equivalents are squarely within it. It is not useful to scientists and engineers for courts to magnify scientific differences beyond their reasonable meaning.

If indeed the majority wishes to redefine this court's precedent on the doctrine of equivalents, as in the majority's footnote 8,

this important issue should be confronted directly, as a matter of public policy. The patent-user community is entitled to rely on judicial decisions as they exist and until they are overruled as a matter of law, not as some might prefer to have written them.

I

The devices at issue contain multiple elements, and the claims contain many limitations. Perkin-Elmer has not claimed a two-element invention, and has not sought enforcement in those terms; as will be apparent from a review of the devices and the claims at issue.

*The Devices*

The electrodeless discharge lamp (EDL) was a known spectral line light source. At the time of the invention of the '884 device EDL systems were of limited practical use as light sources in atomic absorption spectroscopic analysis, due to their high cost, large size, unreliable operation, and undesirable electromagnetic radiation. However, EDLs had the capability of analysis of certain chemical elements not readily analyzable by the hollow cathode lamp then in use. Both Perkin-Elmer and Westinghouse recognized a need for EDLs having the reliability, low cost, and small size that would enable them to be routinely used for chemical analysis in existing spectrophotometric equipment.

In 1970 Westinghouse started a research program on EDLs, assigning engineers Robert M. Hruda and George K. Yamasaki to investigate lamps operating at radio frequencies below 915 megahertz, and Walter Hayter to investigate EDLs operating at microwave frequency of 2450 megahertz. Hruda, who was described as a distinguished engineer and who testified as a Westinghouse expert witness, and Yamasaki learned from the technical literature that EDLs operating at microwave frequencies were easier to start and had a longer expected life, and in the course of a two-year research program developed a 915 megahertz microwave cavity/EDL combination that met the requisite size limitations. Westinghouse exhibited this device

at a national conference on Analytical Chemistry and Applied Spectroscopy in March of 1973. Hruda was granted U.S. Patent No. 3,826,950 for this microwave EDL, but the device had several inadequacies and was not commercialized.

In 1971 Perkin-Elmer was also trying to develop an EDL for the same use. Perkin-Elmer's engineers selected the radio frequency of 27.12 megahertz, for reasons that were explained at trial, but the devices they developed required a separate ignition coil, were not self-starting, and the impedance match was not good. In 1972 Fred C. Gabriel was asked to try to solve these problems.

Gabriel also selected the radio frequency of 27.12 megahertz. But he created an entirely different EDL system using a helical resonator, a system not previously used with EDLs. His system eliminated complex starting circuits and was self-starting if the lamp went out during use. It met all the goals of reliability, size, economy, and effectiveness. This is the device of the '884 patent.

The Gabriel device was exhibited at the same March 1973 conference on Analytical Chemistry and Applied Spectroscopy. As found by the district court, Westinghouse sought to obtain the Perkin-Elmer device in order to learn the details of its construction. *Perkin-Elmer Corp. v. Westinghouse Electric Corp.*, No. 77 C 1923, slip op. at 16 (E.D.N.Y. Aug. 19, 1985). Meanwhile Westinghouse began development of a device operating at the radio frequency of 27.12 megahertz, which it had learned at the exhibit. In early June 1973 Hruda designed circuitry that met the dimensional requirements Perkin-Elmer had achieved, but his device was considered unsuitable because of its sensitivity to temperature variations, and was subsequently abandoned.

The district court found that it was not until July of 1973, when the Perkin-Elmer device was obtained and dismantled, that Westinghouse learned that the Perkin-Elmer device had a quarter-wavelength helical resonator coil, and that the coil was open circuited at one end, and coupled into the r–f power supply by a transformer. *Id.* at 16–17. By September of 1973 Hruda had constructed a 27.12 megahertz EDL using a quarter-wavelength helical resonator coil, open circuited at one end, and coupled into the r–f power supply by a transformer. This device was commercialized. It contained all the elements of the Perkin-Elmer device, but used a known alternative form of transformer. It was called Westinghouse I at trial.

Westinghouse later developed Westinghouse II, identical to Westinghouse I except that some of the turns of the quarter-wavelength coil were replaced with a capacitor. The district court stated: "The alterations were known prior art options for helical resonator circuits." *Id.* at 18.

### The Patented Invention

Gabriel's '884 patent, entitled "Electrodeless Discharge Lamp and Power Coupler Therefor", describes the purpose of the invention as follows:

> to provide a spectral source electrodeless discharge lamp operating unit which includes an inductive resonator coupler, for coupling r–f electric power into the lamp for starting and operating it, that provides efficient coupling, that is simple and economic to construct and operate, that provides the requisite voltage and current ratios for starting the lamp and then for maintaining it in operation without intermediate switching means or alternative power supply connections, and that has an automatic self starting capability if the lamp goes out during operation.

Gabriel's invention is claimed in the standard way, as the combination of its several components; see claim 1 in the majority opinion. Although the majority has ignored all of the claim limitations except those of claim clauses (h) and (i), which relate to the transformer coupling to the r–f power source, Gabriel's invention is the entire combination, as illustrated in the patent drawing:

The inductive resonant coupler (11) provides both the high voltage electrostatic field needed to start the EDL (10) and the electromagnetic field needed to run the EDL by r–f power from generator (12). The resonant coupler is a cylindrical shield (14) made of conductive material, with a helical coil (15) concentrically spaced inside the cylinder.* The coil is of a length equal to one fourth the wavelength of the resonant frequency of the r–f power. One end of the coil is grounded at (18); the other end is open circuited, except for the optional provision of a trimming capacitor (32) between the cylindrical shield and the helical coil, as a fine tune adjustment of the resonant frequency. The coil is coupled to the r–f generator at tap (26) by connector (25) and coaxial cable (27).

At the frequency of the Gabriel design, 27.12 megahertz, the helical resonator is capable of a substantially higher electrical "Q" value than the prior art tank circuits, thus providing the high starting voltage that contributes to the success of the combination. When the power from the r–f generator is first applied to the helical resonator and the lamp has not yet started to discharge, the circuit has an impedance of 400 to 500 ohms and a very high "Q", with a voltage maximum at the open-circuited end of the coil. The high voltage creates the potential that ionizes the gas in the lamp. When the discharge starts, the "Q" of the helical resonator drops, the voltage subsides, and the lamp maintains discharge

through power provided in the turns of the coil. Should the discharge extinguish, by Gabriel's design the voltage builds in the open-circuited end of the coil and the discharge spontaneously reignites. There is eliminated the intermediate switching or alternative power supply connections that were previously required to operate EDLs, as well as the necessity for adjustment in operation to maintain an impedance match.

The Westinghouse device works the same way. As stated in the '884 patent, a device with these characteristics and advantages was not previously known, although helical resonators were well known. Further, the district court found that Westinghouse was unable to make a successful device until it adopted the details it learned by dismantling the Perkin-Elmer device. The majority has denigrated these facts. Although not controlling of the result, such facts are always to be considered in the application of equitable principles. Precedent binds us to apply equitable principles when required "[t]o temper unsparing logic and prevent an infringer from stealing the benefit of an invention". *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

*The Claim Clauses*

Each claim clause was explained by experts and made the subject of specific find-

---

* The majority asserts that Gabriel did not describe his coupler as a "helical resonator"; Gabriel described his invention as a "resonator coupler" having a "helically coiled wire", and

the district court found "that by using a helical resonator [Gabriel] was able to achieve an essentially self-starting unit". *Id.* at 11.

ings, variously contested on appeal. The majority does not discuss the claim limitations other than those of claim clauses (h) and (i). When the invention is considered in its entirety, as delineated in all of the claim clauses, clauses (h) and (i) are placed in perspective. To apply clauses (h) and (i) in anything other than the context of the entire claimed invention is improper claim analysis. *Martin v. Barber*, 755 F.2d 1564, 1568, 225 USPQ 233, 235 (Fed.Cir.1985); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1364, 219 USPQ 473, 482 (Fed. Cir.1983). The district court considered the entire invention, as must we.

### Clause (a)

The district court found, without dispute on appeal, that the Westinghouse I and II devices are combinations of a helical resonator coupler and an EDL, *Perkin-Elmer Corp.*, slip op. at 32, as stated in claim clause (a):

(a) A resonator coupler for coupling a source of r–f electric power into an electrodeless discharge lamp for starting and operating the lamp[.]

### Clause (b)

It was not disputed that the Westinghouse I and II devices contain the element of claim clause (b):

(b) a grounded hollow cylinder of electrically conductive material open at one end, with a grounded base member at the other end[.]

### Clause (c)

The district court found that the Westinghouse couplers "broadly correspond" to claim clause (c):

(c) a helically coiled wire conductor concentrically within the cylinder and spaced from the inner walls thereof[.]

*Id.* at 20.

### Clause (d)

The district court found that there was a difference in the position of the Gabriel and the Westinghouse lamps, and thus concluded that clause (d) did not read on the accused devices:

(d) means for mounting a discharge lamp substantially concentrically within one end position of the coil[.]

*Id.* at 32. Perkin-Elmer assigns clear error to this finding, and I must agree. Westinghouse argued that its lamp is not wholly contained within the coil, but the claim does not so require and the specification does not so teach. The '884 specification states at column 4, lines 50–54:

The position of the lamp relative to the coil is thus adjustable for finding the exact position at which the energy supplied by the coil ... is coupled into the lamp most efficiently when the lamp is operating.

It was uncontroverted that the Westinghouse lamp positions relative to the coil were adjustable, for this same reason: to match the impedance of the bulb and coupler to the energy source. It was also uncontroverted that in the Westinghouse devices at least a substantial portion of the lamp was within the helical coil, working in the same way as the Perkin-Elmer device. The district court clearly erred in its application of this clause.

### Clause (e)

Claim clause (e) relates to the wave length of the resonator coil:

(e) the wire of the coil being one quarter wave long relative to the free-space wavelength of r–f power intended to be applied for operating a lamp mounted therein[.]

The district court found that Westinghouse I had a quarter-wavelength coil, *id.* at 18, within the plain scope of clause (e). In Westinghouse II some turns of the quarter-wavelength coil were removed and replaced with a capacitor. Although the district court gave cumulative weight to this change, as discussed *infra*, the court stated that the Westinghouse II modifications were "known prior art options for helical resonator circuits". *Id.*

### Clause (f)

Claim clause (f) provides:

(f) the end of the coil at the end portion within which a lamp is adapted to be mounted being toward said base member and being grounded, the other end of the coil being open circuited[.]

Perkin-Elmer's brief contained the following illustration from the record, showing the coil grounded at one end and open circuited at the other:

38 ± 3 TURNS
19.5 TPI

P-E
HELICAL RESONATOR

The district court found that in the Westinghouse I and II couplers one end of the coil was connected to the r–f power source and not to ground. *Id.* at 20. As shown in the drawings, the Westinghouse device differs from the Perkin-Elmer device solely by the inversion of r–f power input and ground.

50 TURNS
23.75 TPI

WESTINGHOUSE
HELICAL RESONATOR
[Westinghouse I]

Westinghouse's expert Hruda testified that the Westinghouse coil is grounded at the *end* of its quarter wavelength, as in claim clause (f), and the rest of the coil is a coupling loop to the r–f power. The district court clearly erred in giving no credence to this fundamental principle of electrical circuitry.

### Clause (g)

It was not disputed that claim clause (g) reads on both Westinghouse I and II:

(g) electrical connecting means for connecting to the coil a source of r–f electrical power that is sufficient to maintain a discharge in a lamp mounted within the coil[.]

The use of radio frequency power to start and operate the lamp is fundamental to the claimed invention. Westinghouse did not challenge this point.

### Clauses (h) and (i)

The majority bases its affirmance of noninfringement on claim clauses (h) and (i). The district court found that neither Westinghouse I nor II was connected to the r–f power supply in the same way as in these claim clauses:

(h) said connecting means being tapped into the coil at a point near, but spaced from, the grounded end thereof,

(i) said point being selected such that, when a lamp mounted in the coil is in operation by r–f power connected to the coil, the coupler is tuned to the frequency of said r–f power and the impedance of said lamp and coupling means at said tap

point substantially matches the impedance of said r–f power source[.] *Id.* at 22–23. The court found that the Westinghouse devices lacked a tap point for the purposes of impedance matching and tuning. *Id.* at 23. The court also found that a coaxial cable used by Westinghouse between the coupler connection and the r–f source was an integral element of its system and was absent from the Perkin-Elmer teaching. *Id.*

Perkin-Elmer states, correctly, that these differences are not significant. The coaxial cable is described in the Perkin-Elmer specification as the "connecting means" of the claim. Perkin-Elmer further points out that clauses (h) and (i) describe a transformer connection between the r–f power source and the helical coil, shown in the prior art as interchangeable with the transformer connection used by Westinghouse. The following illustration is Figure 3 from Macalpine & Schildknecht, *Helical Resonator Design Chart*, 33 Electronics 140 (1960), and shows the loop transformer coupling of Westinghouse on the left side at (B) and the tap (auto)-transformer coupling of Perkin-Elmer on the right side at (B).

*FIG. 3—Pair of helical resonators, side and bottom views (A), and application of resonators to input end of vhf amplifier (B)*

Perkin-Elmer's argument that Macalpine shows this interchangeability of the transformer couplings to the helical resonators

is a controlling factor in this analysis. This reference, used by both Westinghouse and Perkin-Elmer in the design of their respective devices, states:

Coupling into and out of the resonators can be effected by a tap, loop, probe or aperture in a manner analogous to that with straight quarter-wave coaxial lines.

*Id.* at 146. Although the district court, and the majority of this panel, erred in ignoring the Macalpine teaching, the position has not been dropped by Perkin-Elmer.

Westinghouse does not dispute that Macalpine shows the interchangeability of tap and loop transformer coupling to transfer power to the helical resonator. Rather, Westinghouse argues that its coupling does not rely on a tap point in order to achieve an impedance match. Westinghouse (and the majority) thus avoided, or obscured, the issue, by concentrating on a detail of the known difference between an autotransformer and a loop transformer. This difference is illustrated by Macalpine; and is of no moment to their use. It is the similarities between the transformers that are pertinent to this analysis. Both transformers perform the same function (electrical power transfer), in the same way (electromagnetic induction), with the same result (excitation of the resonator). Both transformers achieve an impedance match with the r–f power source. Indeed, Westinghouse's expert Hruda testified that as to these couplings there "would be relatively little difference between Perkin-Elmer on our unit and our head on Perkin-Elmer's unit".

"It has often been said that a useful guide in adjudging the equivalency between a claimed and an accused device is whether persons reasonably skilled in the art would have known of the interchangeability of a part in the accused device with one in the claimed device." *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 82, 193 USPQ 449, 461 (Ct.Cl.1977). In this case the same transformer function is performed in a known interchangeable way with the same result.

It is of compelling weight that interchangeability of these specific transform-

ers in this specific use is taught in the prior art. The record does not support the new interpretation of the principles of physics and law expounded by the majority.

### Clause (j)

As viewed by the district court, claim clause (j), which states:

> (j) whereby when said r–f power is applied to the coil, and before a discharge is ignited in the lamp, a voltage maximum occurs at the open circuited end of the coil and creates a potential extending through the lamp portion between said open circuited end and said base member for ionizing the gas in the lamp[,]

was avoided by Westinghouse because of the court's finding that there is no voltage maximum in the accused devices. *Perkin-Elmer Corp.*, slip op. at 22. This finding is clearly in error. Westinghouse had itself advised the PTO that claim clause (j) "merely recites the inherent function arising from the helical resonator structure."

It is the voltage maximum that creates the potential that ionizes the gas in the lamp, as Westinghouse agreed. This is a known electrical characteristic of helical coils of the Macalpine type, used both in the Perkin-Elmer and the Westinghouse devices. When asked whether there was any difference between the Westinghouse and Perkin-Elmer devices with respect to the electrical phenomena by which they are started, Mr. Hruda responded: "No. Electromagnetic field starts them all."

### The District Court's Analysis

The district court viewed the accused devices as a whole, and assessed the totality of their differences from the '884 claims. The district court found that there were four structural differences between the Westinghouse devices and the '884 claims, as discussed *supra*, which taken together the court found sufficient to avoid infringement. Three of these four differences appear to be based on a misunderstanding of the device, and the fourth on a misperception of the known equivalency of simple electrical structures.

The majority in focusing on only the fourth difference may have recognized the weaknesses in the decision relating to the other three, but by affirming the district court on less than that on which the court relied, the majority has departed even farther from our consistent requirement that the invention as a whole be considered. *See, e.g., Martin*, 755 F.2d at 1568, 225 USPQ at 235; *Hughes Aircraft Co.*, 717 F.2d at 1364, 219 USPQ at 482; *Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 942, 220 USPQ 481, 488–89 (Fed.Cir.1983); *Tate Engineering, Inc. v. United States*, 166 USPQ 329, 335 (Ct.Cl.1970).

The doctrine of equivalents does not authorize judicial revision of the basic invention; the interested public must know with reasonable precision the boundaries of the patent grant. *See General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402 (1938); *McClain v. Ortmayer*, 141 U.S. 419, 423–24, 12 S.Ct. 76, 77, 35 L.Ed. 800 (1891). Nor is the purpose of the doctrine to cure errors curable by reissue, or to authorize judicial reexamination of claims. The purpose is to enable a court to remedy a "fraud on a patent", in the words of *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856, in order to achieve a just result.

Applying the standards established by this court, specifically the "function/way/result" test of *Graver Tank*, the Westinghouse transformer coupling meets all the requirements, as tested by precedent, of equivalency to that of claim clauses (h) and (i). This test has been affirmed and reaffirmed by this court. *See, e.g., D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985); *Martin*, 755 F.2d at 1568, 225 USPQ at 235; *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 862, 226 USPQ 402, 408 (Fed. Cir.1985), *cert. denied*, 106 S.Ct. 1197 (1986); *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974–75, 226 USPQ 5, 8 (Fed.Cir.1985); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900, 221 USPQ 669, 678 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

The Westinghouse devices meet all of the claim limitations. Nothing is "erased", as charged by the majority. *Carman Industries*, cited by the majority for the proposition that the doctrine of equivalents applies when there is a "minor modification", is squarely met in this case, where almost all the claim clauses are infringed literally, and one claim limitation is met by a known equivalent structure. Viewing the invention as a whole, infringement of claim 1 was clearly made out.

## II

There is a presumption that a claim covers, and limits, the subject matter which "the applicant regards as his invention", in the words of 35 U.S.C. § 112. When equitable principles are invoked in pursuit of fairness, to enlarge a claim's reach beyond the applicant's chosen words, there is a special burden on the courts. If courts are not to hinder the progress of technological advance, certainty and predictability are as important in the application of equitable as of legal principles.

The purpose of the doctrine of equivalents is to allow courts to do justice where justice requires. Yet it necessarily dilutes the rigorous certainty that patent claims are intended to provide. A fair balance between these conflicting purposes is not easily struck. We are carried into the tenuous area where equitable considerations favoring a patentee confront, head to head, the historic right and opportunity of scientists and engineers to design around the claims of a patented device.

Yet, unless is it decided by Congress, as a matter of public policy, that the decades of equity are to be revoked or circumscribed, it is not our role to do so. I see little value in the majority's suggestion that inventors should rely on the reissue statute for relief, for this implies that relief is available from that source. The reissue (and reexamination) statutes can not serve this purpose. By reissue enlarged claims are not available after the patent is two years old, even if supported in the specification. 35 U.S.C. § 251. In no event is it possible to add to the specification. Nei-

ther reissue nor reexamination would have allowed Gabriel to add, even one day after his patent was issued, a reference in his specification to Fig. 3 or other disclosure of Macalpine, in order commensurately to broaden his claims.

Patent applicants need include in their patent specifications no more of the prior art than is necessary to convey the invention to those of ordinary skill in the art, who are charged with knowledge of the prior art. *See Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463, 221 USPQ 481, 489 (Fed.Cir.1984). Our predecessor court commented in *In re Smythe*, 480 F.2d 1376, 1384, 178 USPQ 279, 285 (CCPA 1973):

> The alternative places upon patent applicants, the Patent Office, and the public the undue burden of listing, in the case of applicants, reading and examining, in the case of the Patent Office, and printing and storing, in the case of the public, descriptions of the very many structural or functional equivalents of disclosed elements or steps which are already stored in the minds of those skilled in the arts, ready for instant recall upon reading the descriptions of specific elements or steps.

That established law is useless, however, if courts refuse to recognize such dramatic "structural and functional equivalency" as is contained in the Macalpine article, illustrated *supra.*

Although it is my view that infringement litigation is not the best way to reach the technological judgments involved in equivalency determinations, the judicial system provides no ready alternative. One might fault Gabriel for failing to discuss or claim the known alternative prior art transformers, but the law was on his side, until today. The "semantic strait jacket" imposed on Perkin-Elmer by the majority, ignoring the prior art, is in derogation of our own precedent.

Failure of this court to reach consistent decisions based on a consistent application of precedent will be as destructive of the purposes of a patent system as was the forum-shopping and inconsistent judgments

of the past. I repeat my concern at the majority's categorization in footnote 8 of much of this court's jurisprudence as "dicta". That message can not reassure those who hoped that this court would bring stability, not turmoil, to the patent law. If the majority wishes to redirect the judicial approach to equivalency, it does not write on a clean slate. That slate includes much more than this court's decisions, and can no more be erased than can the clauses of Perkin-Elmer's claims; although the law can surely be refined as new facts probe its boundaries. I suggest that this discussion by the majority is itself dicta—a luxury usually reserved to dissents.