# United States Court of Appeals
# for the Federal Circuit

---

**AUGME TECHNOLOGIES, INC.,**
*Plaintiff/Counterclaim Defendant-Appellant,*

AND

**WORLD TALK RADIO, LLC,**
*Counterclaim Defendant-Appellant,*

**v.**

**YAHOO! INC.,**
*Defendant/Counterclaimant-Appellee.*

---

2013-1121, -1195

---

Appeals from the United States District Court for the Northern District of California in No. 09-CV-5386, Magistrate Judge Joseph C. Spero.

---

Decided: June 20, 2014

---

JENNIFER A. ALBERT, Goodwin Procter LLP, of Washington, DC, argued for all appellants. With her on the brief were, THOMAS J. SCOTT, JR., DAVID M. YOUNG, and ELEANOR M. YOST. Of counsel on the brief was GREGORY S. BISHOP, of Menlo Park, California.

DEANNE E. MAYNARD, Morrison & Foerster LLP, of Washington, DC, argued for defendant/counterclaimant-appellee. With her on the brief were DANIEL P. MUINO, and MARC A. HEARRON; and RACHEL KREVANS and RICHARD S.J. HUNG, of San Francisco, California.

---------------

Before MOORE, SCHALL, and REYNA, *Circuit Judges.*

MOORE, *Circuit Judge.*

Augme Technologies, Inc. (Augme) sued Yahoo! Inc. (Yahoo!) alleging infringement of certain claims of U.S. Patent Nos. 6,594,691 and 7,269,636 (collectively, the Augme patents), and Yahoo! counterclaimed that Augme and World Talk Radio, LLC (collectively, Appellants) infringed certain claims of U.S. Patent No. 7,640,320. After claim construction, the court granted Yahoo! summary judgment of noninfringement. The district court also entered judgment that certain means-plus-function terms in claims 19 and 20 of Augme's '691 patent were indefinite. Finally, Appellants stipulated to infringement of the asserted claims of Yahoo!'s '320 patent based on the court's claim construction. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

On appeal, Augme challenges the district court's determination that Yahoo!'s accused systems do not infringe the Augme patents either literally or under the doctrine of equivalents and that claims 19 and 20 of the '691 patent are indefinite. We affirm the grant of summary judgment of no literal infringement and of no infringement under the doctrine of equivalents based on the "embedded" limitation. We also affirm the grant of summary judgment that claims 19 and 20 are indefinite.

Appellants appeal from the judgment that they infringe the '320 patent and challenge the district court's construction of the claim term "server hostname." Appel-

lants also appeal from the district court's judgment that claim 7 of the '320 patent is not indefinite. We affirm the district court in all respects with regard to the '320 patent.

## I. Summary Judgment of Yahoo!'s Non-Infringement of the Augme Patents

We review summary judgment decisions under regional circuit law. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011). The Ninth Circuit reviews the grant of summary judgment de novo. *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1148 (9th Cir. 2010). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, we credit all of the nonmovant's evidence and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Background

The Augme patents share a common specification that discloses adding functionality, such as media or advertisements, to a web page. '691 patent col. 1 ll. 41–51, col. 14 ll. 18–22. The disclosed embodiments include two code modules. A first code module is embedded in a web page downloaded by a web browser. *Id.* col. 6 ll. 9–18. The embedded first code module issues a command to retrieve a second code module from a server. *Id.* The second code module contains the code for the added functionality and a "service response." *Id.* col. 12 ll. 38–55, col. 17 ll. 22–23. The patents explain that the service response may indicate either a customized or predetermined service and include media that was requested. *Id.* col. 8 l. 22 – col. 9 l. 28, col. 12 l. 56 – col. 13 l. 3. However, if the web page content is objectionable or "unacceptable to be displayed with" the requested media, then the patents disclose

returning a service response that indicates a denial of service. *Id.* col. 7 ll. 36–56. The service response may indicate a denial of service by displaying a "media appliance metaphor" with a slash through it, or by not displaying any media appliance metaphor at all. *Id.* col. 7 ll. 59–63.

Each asserted claim recites: (1) a "service response" contained in the second code module; and (2) an "embedded" first code module that "retrieves" or "initiates retrieval"[1] of the second code module. '691 patent claims 19–21, 25; '636 patent claims 1–3, 9, 14, 20, 25. Claim 1 of the '636 patent is representative (emphases added):

> A method of operating a computer network to add function to a Web page comprising:
>
> downloading said Web page at a processor platform, said downloading step being performed by a Web browser;
>
> when said Web page is downloaded, automatically executing *a first code module embedded in said Web page*;
>
> *said first code module issuing a first command to retrieve a second code module*;
>
> assembling, in response to said issuing operation, *said second code module having a service response*;
>
> said first code module issuing a second command to initiate execution of said second code module; and

---

[1] Claim 19 of the '691 patent recites that the first code module "initiate[s] a download" of the second code module, but the parties do not distinguish between initiating "retrieval" and initiating "a download."

initiating execution of said second code module at said processor platform in response to said second command.

The accused Yahoo! systems distribute advertisements for display in web pages.[2] For example, a web page publisher that wants to add advertisements to its web page may contract with Yahoo! to obtain "smart tags," which allow Yahoo!-distributed advertisements to be displayed in the web page. The smart tag (the alleged embedded first code module) is embedded into the developer's web page. Once the web page is downloaded, the browser executes the smart tag to download an intermediary piece of code called "smart code" from the Yahoo! server. The browser executes the smart code to send various parameters to the Yahoo! server and to request an "imp code" (the alleged second code module). The imp code returned to the browser includes an "ad code" (the alleged service response) that either includes an advertisement for display or is blank. For example, if the Yahoo! systems are able to locate a suitable advertisement for display based on parameters sent by the smart code, then an advertisement is included in the ad code. On the other hand, if the Yahoo! systems are unable to locate a suitable advertisement, a blank ad code is returned.

The district court granted summary judgment of noninfringement to Yahoo!. It held that the accused Yahoo! systems do not meet the (1) "service response" or (2) "embedded first code module" limitations. We discuss each limitation in turn.

---

[2] The accused Yahoo! systems, RMX and APT, function similarly for the infringement purposes at issue on appeal but use different terminology. For simplicity, we use the terminology which describes the RMX system.

B.  "service response"

The district court construed "service response" to be "a response that indicates whether the downloaded web page is permitted to have access to a requested function . . . ." *Augme Techs., Inc. v. Yahoo!, Inc.*, C.A. No. 09-05386-JCS, slip op. at 15–18 (N.D. Cal. Sept. 27, 2011), ECF No. 192 (*Claim Construction Order*).  It then granted summary judgment of noninfringement to Yahoo! because it determined, as a matter of law, that Yahoo!'s ad codes were not service responses.  *Augme Techs., Inc. v. Yahoo!, Inc.*, C.A. No. 09-05386-JCS, 2012 WL 3627408, at *7–9 (N.D. Cal. Aug. 21, 2012) (*Summary Judgment Order*).  In particular, the district court determined that returning a blank or advertisement-containing ad code does not indicate "whether permission is granted or denied."  *Id.* at *9.

On appeal, the parties do not challenge, and therefore we do not address, the district court's construction of service response as requiring an indication of permission. There is no real dispute regarding how the Yahoo! systems function, but only over whether a reasonable jury could conclude that the Yahoo! functionality includes an indication about web page permission.  Augme's expert testified that the accused Yahoo! systems process information related to ad requests, such as processor platform and web browser information, to find an ad that is the "best match" for each ad request.  J.A. 7058–60 ¶¶ 7, 12, 13.  He explained that if the Yahoo! system "locates a suitable ad" based on this information, it includes the advertisement in the ad code, and if it "cannot satisfy the ad request," it returns a blank or default ad code.  *Id.* Augme's expert equated this advertisement suitability determination with permission.  *Id.*  Yahoo!'s 30(b)(6) witness similarly testified that the accused Yahoo! systems return a blank or advertisement-containing ad code based on this suitability requirement, i.e., whether the system is "able to fill an ad."  J.A. 6746.  Yahoo!, however,

argues that advertisement suitability is different than permission and thus returning an advertisement-containing or blank code based on a suitability determination does not indicate anything about permission.

We hold that there is a question of material fact as to whether a blank or advertisement-containing ad code is an indication of "permission" in light of both the district court's construction and the Augme patents. The district court rejected Augme's proposed construction of "service response," which would have required that it indicate a denial of, customized, or default service to be rendered on a web page. *Claim Construction Order* at 15. It noted that this proposed construction was a limitation in a dependent claim, and thus "service response" was presumed to be broader by virtue of claim differentiation. *Id.* at 17. It thus concluded that service response should be construed as "a response that indicates whether the downloaded web page is permitted to have access to a requested function." *Id.* at 18. Thus, according to the district court's construction, an indication of permission included, but was necessarily broader than, a response indicating a denial of, customized, or default service.

The Augme patents tie together the notions of permission and suitability when they disclose sending a service response including an indication of permission (e.g., via one of a denial of, customized, or default service) in response to a suitability determination about the requested media. On the one hand, the patents disclose that if the web page content is objectionable or "unacceptable to be displayed with" the requested media, then the patented system forms a service response indicating a denial of service. '691 patent col. 7 ll. 36–56. The service response may indicate a denial of service by displaying a "media appliance metaphor" with a slash through it, or by not displaying any media appliance metaphor at all—i.e., a blank service response. *Id.* col. 7 ll. 59–63. On the other

hand, if the web page content is not objectionable or unacceptable, then a service response is displayed that indicates either a customized or predetermined service and includes the requested media. *Id.* col. 8 l. 22 – col. 9 l. 28, col. 12 l. 56 – col. 13 l. 3.

We reject the district court's conclusion that returning a blank ad code cannot meet the service response limitation. The embodiments disclosed in the Augme patents expressly do just that—they indicate a denial of service with a service response that omits the media appliance metaphor altogether, i.e., a blank service response. *Id.* col. 7 ll. 59–63, col. 12 ll. 51–55. We also reject Yahoo!'s argument that a blank ad code cannot be a service response because the Yahoo! systems do not "check whether the requesting web page has permission to access an advertisement." Appellee's Br. 26. This argument is based on elements not present in the claim or the construction of service response. The asserted claims do not require an independent permission-checking step—only an indication of whether the web page has permission.

The Yahoo! systems return either an advertisement or blank code based on the suitability of a particular advertisement. The evidence of record demonstrates that there is a genuine issue of material fact as to whether these advertisements or blank codes provide an indication of web page permission in the context of the Augme patents and the district court's construction. Thus, the "service response" limitation is not a basis upon which we can affirm summary judgment of noninfringement.

## C. "embedded first code module"

The district court construed "embedded" to mean "written into the HTML code of the web page," and explained that this construction was consistent with the term's plain meaning. *Claim Construction Order* at 12–14. The district court explained that this construction

expressly excluded "a code module that is retrieved via external linking," i.e., code not actually in the web page HTML, but separately retrieved after the web page download. *Id.* The court then concluded that Yahoo!'s accused systems do not include an "embedded" first code module that "initiates retrieval" of a second code module either literally or under the doctrine of equivalents. *Summary Judgment Order* at *9–12. On appeal, Augme challenges the court's construction that embedded code excludes linked code and its grant of summary judgment of literal infringement and infringement under the doctrine of equivalents.

1. Construction of "embedded"

Augme argues on appeal that the district court's construction is erroneous because embedded code can include linked code, i.e., code not actually in the web page HTML, but separately retrieved after the web page download. We agree with the district court's construction.

The asserted claims support the distinction between embedded code and linked code. Each asserted claim recites that the first code module is "embedded" or "configured to be embedded" and that the second code module is "retrieve[d]" or "download[ed]." '691 patent claims 19–21, 25; '636 patent claims 1–3, 9, 14, 20, 25. This distinction creates a presumption that "embedded" means something different than "retrieved" or "downloaded." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("[D]ifferent claim terms are presumed to have different meanings."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). Augme admits that its proposed construction—that embedded code includes code that is linked—would mean that the second code module is also "embedded." The second code module is not written into the web page, but rather retrieved, downloaded, and

incorporated into the web page. If embedded were construed as including code that is not itself written into the webpage, but is rather linked—retrieved and downloaded—then both the first and second code modules would be embedded according to this definition. This would render meaningless the distinction between the embedded first code module and the downloaded or retrieved second code module.

Augme asserts that there is no lexicography or disavowal in the specification that requires embedded code to exclude linked code. Appellants' Br. 26–28. Augme's argument is inapposite. It is well established that a patentee may deviate from the plain and ordinary meaning of a claim term by disavowing claim scope or acting as his own lexicographer. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). But that principle does not apply here because the patentee is not deviating from the plain and ordinary meaning of "embedded." Linked code is not "written into the HTML code of the web page." It is, instead, separately retrieved by other embedded code that references or points to the linked code. Code that is merely referenced for future insertion into a web page is not written into the HTML code in that web page. For example, an HTML link can itself be embedded in the web page, but the code that is retrieved when the link is executed is located elsewhere. The plain and ordinary meaning of embedded code is code written into the HTML code of the web page.[3] Code

---

[3] Augme argues that its expert testified that the plain meaning of "embedded" code includes externally linked code. Augme's expert declared that "[o]ne method for embedding code into a code module is to provide some of the code in one file with a reference to other code in another file." J.A. 1191 ¶ 8. Augme's expert's admitted, however, that in that case the web page only

which is incorporated into the web page from another location is not embedded, it is linked.

Rather than disavow the plain meaning, the specification reinforces the plain-meaning construction that excludes linked code. It explains that "the present invention teaches of a method and system for adding function . . . to a Web page, through the implementation of a simple code module *embedded in the HTML* of the Web page." '691 patent col. 14 ll. 18–22 (emphasis added); *see also id.* col. 2 ll. 36–41, col. 4 ll. 63–65. It continues, "the code module is . . . readily copied and pasted into a Web page during Web page development activities." *Id.* col. 14 ll. 26–28. Linked code is, by definition, not copied and pasted into a web page during development. The Augme patents distinguish code embedded in the web page from retrieved code that is obtained via a network connection and separately downloaded. *See, e.g.*, *id.* col. 2 ll. 36–58, col. 4 l. 63 – col. 5 l. 17, col. 6 ll. 3–19, col. 7 ll. 19–32.[4] The link to the second code module is embedded in the web page, but

---

"[c]onceptually" includes the linked code. *Id.* ¶ 10. Yahoo!'s expert, consistent with the specification, testified that one of skill in the art would not have considered a linked code module to be embedded. J.A. 1622 ¶ 3.

[4] To the extent that Augme argues that the preferred embodiment includes an "embedded" first code module which includes an externally linked "CGI program" file, we do not agree. *See* '691 patent col. 5 ll. 2–19, Fig. 2. That embodiment does not describe the CGI program as a part of the first code module. Indeed, Figure 1, which depicts a block diagram of the preferred embodiment, shows CGI program 84 as a separate component from first code module 36. *Id.* Fig. 1. Thus, the patents do not define embedded code, contrary to its plain meaning, to include linked code.

the linked code (the second code module itself) is not embedded. *Id.* We conclude that the district court's construction of "embedded" is correct; embedded code would not be understood by one of skill in the art to be code that is linked.

### 2. Literal Infringement

The district court granted Yahoo! summary judgment that its accused systems do not literally infringe the asserted claims because it determined that Yahoo!'s embedded smart tag could not be the first code module under its construction. *Summary Judgment Order* at *9–11. In particular, the district court determined that the smart tag does not "retrieve" or "initiate retrieval of" the imp code (the alleged second code module)—it downloads the intermediary smart code, and it is that downloaded smart code which retrieves the imp code. *Id.* at *17–18.

Augme contends that there is a factual dispute as to whether the smart tag's retrieval of the smart code "initiates retrieval of" a second code module. In essence, Augme argues that because the embedded smart tag begins a process which ultimately results in retrieval of the imp code, a jury could conclude that this smart tag initiates the retrieval process.

We affirm the district court's grant of summary judgment of no literal infringement based on the "embedded first code module" limitation. Yahoo!'s embedded smart tags do not initiate retrieval of the imp code (the alleged second code module); the non-embedded smart code does. In the accused Yahoo! systems, the embedded smart tag retrieves an intermediary smart code. This smart code is not embedded under the district court's construction; it is separately downloaded. After it is retrieved, the smart code, in turn, retrieves the imp code (the alleged second code module). Thus, the Yahoo! systems cannot literally infringe because they contain two sets of code: one that is

embedded but does not retrieve the alleged second code module and another that retrieves the alleged second code module but is not embedded. As the district court correctly concluded, the embedded smart tags do not "initiate retrieval of the second code module as required by the claims; rather [they issue] a command to download other code." *Summary Judgment Order* at *10. Because Yahoo!'s non-embedded smart code initiates retrieval of the alleged second code module, there can be no literal infringement.

### 3. Doctrine of Equivalents

The district court also granted summary judgment that the Yahoo! systems do not include an "embedded first code module" under the doctrine of equivalents. *Summary Judgment Order* at *11–12. Augme asserts that summary judgment is improper because there is a genuine issue of material fact as to whether the combination of the embedded smart tag and the separately retrieved, non-embedded, smart code (a combination that Yahoo! refers to as the "Combined RMX Module")[5] is equivalent to the recited first code module. Augme asserts that the Combined RMX Modules are "partially embedded," which can be equivalent to "embedded." Augme argues it presented evidence such that a reasonable jury could find that the Combined RMX Module is only insubstantially different from the embedded first code module. It also contends that both its and Yahoo!'s experts presented evidence that the Combined RMX Module satisfies the function-way-result test. Augme asserts that the district

---

[5] The APT equivalent is referred to as the "combined APT module." We continue to use the RMX terminology even though the analysis is equally applicable to the APT system.

court failed to address its function-way-result test arguments below.

We affirm the district court's grant of summary judgment. As construed, embedded code does not include externally linked code. Augme's arguments that the Combined RMX Module is equivalent to the embedded first code module are essentially identical to its claim construction arguments: namely that linked code can fall within the definition of embedded code. No reasonable jury could find equivalence here because doing so would require a determination that embedded code is substantially the same as linked code—the very thing that the construction of "embedded" excludes. "[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994). While we have recognized that literal failure to meet a claim limitation does not necessarily constitute a "specific exclusion," *see Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998), we have found "specific exclusion" where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation. *See, e.g.*, *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346–47 (Fed. Cir. 2001). Because the Augme patents make clear that embedded and linked code are opposites, we agree with the district court that they "cannot possess only insubstantial differences." *Summary Judgment Order* at *12.

Further, the record evidence does not create a genuine issue of fact regarding whether embedded code is insubstantially different from linked code or whether the function-way-result test is met. Augme's expert declaration fails to create a genuine issue of material fact. The relevant testimony reads:

18. Notably, the World Wide Web Consortium ("W3C") makes no distinction in behavior or execution between JavaScript code written inline between the HTML <script> tags and code using a <script> tag containing a "src" attribute. . . .

19. From the standpoint of the execution of the code and its effect in the Web page, *the results* of using code entirely embedded in a Web page (e.g., code written entirely inline) and code partially embedded *are the same*.

20. There is no substantial difference between including source code by reference and writing that source code entirely in the web page.

21. There is no *substantial functional difference* between using a "first code module embedded in [a] Web page" – what under the district court's interpretation includes inline code – versus using code that is partially embedded and partially incorporated using the "src" attribute command into a web page, as done in web pages utilizing the accused products.

22. Yahoo!'s ad serving systems perform *the same function, in substantially the same way, to receive substantially the same results* as if the entire first code module were written inline in the web page.

23. Writing inline using an HTML editor in contrast to retrieving the referenced code from an external file has no bearing on the claimed function.

J.A. 7060–61 (emphases added). Even if we were to determine that this testimony creates a genuine issue of material fact regarding the "function" and "result" prongs (e.g., at paragraphs 19 and 21), there is no testimony regarding whether the Combined RMX Module and the embedded first code module perform the recited functions in substantially the same "way." Paragraph 22's restate-

ment of the function-way-result test itself is simply not enough.  To survive summary judgment of noninfringement under the doctrine of equivalents, Augme had to present evidence of equivalence under each prong of the function-way-result test.  *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 n.6 (Fed. Cir. 1987) ("That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way.").  Augme failed to present the required evidence.

Yahoo!'s expert testimony does not provide for Augme its missing evidence.  First, the testimony compares "the function way and result of the patent to the function-way-result of the accused products."  J.A. 6993.  This testimony does not focus on the relevant inquiry: the function-way-result test compares a *limitation* of a claim to an *element* of an accused product, not the entire patent to the entire product.  *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1338–39 (Fed. Cir. 2011).  Second, even if the testimony were of proper scope, it is conclusory, stating only that the product would "operate the same," "perform [the functions described in the patent] in essentially the same way," and "would [produce] the same result."  J.A. 6993–94.  It offers no explanation beyond these conclusory statements.  We recognize that this testimony is from Yahoo!, not Augme.  However, even considering the source, we cannot give it any more evidentiary weight than it deserves.

The district court correctly concluded that the Yahoo! systems' Combined RMX and APT Modules are not equivalent to the recited "embedded first code module."  The district court rejected Augme's equivalence argument,

explaining that writing code directly into a web page HTML and linking to external code are substantially different. It cited the differences, including that the external linking allows a code owner to more easily maintain the code, as it is stored on the owner's own servers. In contrast, writing code directly into a web page means the page must be edited every time the code is edited. It also noted that external linking requires contacting a server to retrieve code which could fail to return code. The Augme patents themselves repeatedly set out two different alternatives: embedded code and code which is retrieved and downloaded (linked code). *See, e.g.*, '691 patent col. 2 ll. 36–58, col. 4 l. 63 – col. 5 l. 17, col. 6 ll. 3–19, col. 7 ll. 19–32. In light of these undisputed differences in the way in which linked versus embedded code operates, we cannot conclude that Yahoo!'s expert's conclusory statement about equivalence satisfies Augme's burden to show a genuine issue of fact regarding infringement under the doctrine of equivalents. The district court thoroughly and correctly analyzed this issue. We therefore affirm the grant of summary judgment of noninfringement under the doctrine of equivalents.

## II. Summary Judgment of Invalidity of Augme's Means-Plus-Function Claims

The district court held that claims 19 and 20 of the '691 patent are indefinite. It determined that the phrase "means for assembling, at said server system, said second computer readable code module," is an indefinite means-plus-function limitation because the patent does not disclose any structure or algorithm for performing the recited assembling function.[6]

---

[6] The court also held that claims 19 and 20 were indefinite for three other independent reasons. Because we

It is undisputed that "means for assembling" is a computer-implemented means-plus-function limitation. Thus, to meet the definiteness requirements of 35 U.S.C. § 112, second paragraph, the specification must disclose an algorithm for performing the claimed function. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008). Certainly, the algorithm may be expressed in "any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (citations omitted). But it must disclose *some* algorithm; it cannot merely restate the function recited in the claim. *Id.*

Augme contends that the specification discloses an algorithm for assembling the second computer readable code module. It contends that Figure 5 and its accompanying text disclose how a service response is formed and distributed. It asserts that the specification then describes how the second code module is assembled, '691 patent col. 11 l. 60 – col. 12 l. 1, and even provides "software code" for doing so, *id.* col. 4 ll. 51–60.

We affirm the district court's conclusion of indefiniteness because the '691 patent does not disclose any algorithm for assembling the second computer readable code module. Figure 5 and its accompanying text describe a process for providing a service response, not for assembling the second code module. *See id.* col. 6 ll. 36–37 ("Fig. 5 shows a flow chart of a service response provision process . . . ."). The Figure 5 process includes a single step 238 labeled "[a]ssemble second code module," but this

affirm based on the specification's lack of description of any structure or algorithm required to perform the assembling function, we do not consider the other reasons.

merely restates the recited function. *Id.* Fig. 5. The portion of the specification describing this step explains that "code assembler instructions" do the assembling. *Id.* col. 11 ll. 60–61. It discloses inputs to and outputs from the code assembler instructions, but does not include any algorithm for how the second code module is actually assembled. *Id.* col. 11 l. 60 – col. 12 l. 1. Simply disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render the means-plus-function term definite. *See, e.g., ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518 (Fed. Cir. 2012). The portion of the specification that Augme asserts discloses "software code" for assembling the second code module does no such thing. It merely explains that "[c]ode assembler instructions" are executed "to assemble a second code module." '691 patent col. 4 ll. 54–60. Again, this is nothing more than a black box. Because the '691 patent does not disclose an algorithm for performing the claimed function of assembling the second code module, we affirm the district court's grant of summary judgment that claims 19 and 20 of the '691 patent are invalid.

## III. Summary Judgment of Appellants' Infringement of the '320 Patent

Yahoo!'s '320 patent is directed to retrieving digital content over a computer network using a unique identifier assigned to the content. '320 patent col. 1 ll. 54–65. The digital content is associated with a server hostname and a filename. *Id.* col. 17 l. 59 – col. 18 l. 3, col. 27 ll. 42–44. A website link to the digital content includes a unique identifier assigned to the digital content, but does not include the server hostname or the filename. *Id.* col. 27 ll. 48–52; *see id.* col. 17 ll. 27–35. When a user clicks the link, the browser sends the identifier to a server, the server looks up the server hostname and filename corresponding to the unique identifier, and the requested content is provided to the user based on the server host-

name and filename.  *Id.* col. 27 l. 51 – col. 28 l. 10; *see id.* col. 17 l. 30 – col. 18 l. 26.  Each asserted claim recites a "server hostname."  Claim 1 is representative (emphases added):

A method comprising:

receiving, by an ingest server, digital content from a client;

storing, by a repository server, the digital content, the digital content having an associated *server hostname* and a filename;

assigning a unique identifier to the digital content, and associating the unique identifier, *server hostname* and filename;

providing the client with a link containing the unique identifier but not the *server hostname* and filename associated with the digital content's unique identifier;

receiving, by a playlist server, a request for the content, the request based on activation of the link, the request including the unique identifier but not the *server hostname* and filename associated with the digital content's unique identifier;

determining, by the playlist server, the *server hostname* and filename based on the unique identifier received with the request;

creating, by the playlist server, a redirector file, the redirector file including the *server hostname* and filename associated with the digital content's unique identifier, the redirector file is returned in response to the request.

The district court construed "server hostname" to be a "network name of a server."  Appellants stipulated to infringement based on this construction.  On appeal,

Appellants challenge that construction as overly broad and argue that "server hostname" should be construed as "the network name of the particular media server in a content management system from which the digital content is served to the end user."

We agree with the district court's construction which is consistent with the term's plain meaning. Indeed, as Appellants admit, "[t]here appears to be no real dispute that 'hostname' refers to the network name of a particular server on a network." Augme's and World Talk Radio's Responsive Claim Construction Brief, *Augme Techs., Inc. v. Yahoo! Inc.*, C.A. No. 09-05386-JCS, at 15–16 (N.D. Cal. Sept. 27, 2011), ECF No. 193 (relying on dictionary definition and Yahoo!'s expert testimony to construe "hostname").

Appellants' attempts to add two limitations to this plain-meaning construction are improper. Appellants propose adding: (1) that the server hostname refers to a "media server in a content management system" and (2) that digital content is served from that particular media server to the end user. Neither the specification nor the prosecution history includes any lexicography or disavowal that would justify a departure from the plain meaning. *Thorner*, 669 F.3d at 1365.

With regard to the first limitation, the claims do not even recite a "content management system." Moreover, while Appellants point to portions of the '320 patent that purportedly distinguish between client or end-user servers and content management servers, these portions undisputedly do not define or otherwise require the server hostname to refer only to a server in a content management system. *See* '320 patent col. 1 ll. 47–54, col. 4 ll. 12–16.

Regarding the second limitation, Appellants assert that the claim requires a "redirector file," and that the

specification requires the redirector file to include the server hostname that is "the location . . . of the particular media server 120 containing [the digital content]." *Id.* col. 17 ll. 62–65, col. 26 ll. 20–41. Again, however, the portions of the specification that Appellants cite do not redefine "server hostname" to correspond to the server that serves digital content to the end user. Moreover, claim 1 does not even recite returning digital content. We refuse to incorporate this additional limitation from the specification into the asserted claims.

There is no reason to deviate from the plain meaning of server hostname based on any arguments made during prosecution. Yahoo!'s statements during original prosecution and reexamination do not limit the server hostname to a media server from which the digital content is served. Augme contends that during original prosecution, Yahoo! stated that a server hostname corresponds to a server that serves digital content. However, Yahoo! expressly qualified this characterization of "server hostname" as being exemplary. J.A. 2611 ("[A] server . . . creates a redirector file, which contains a reference to the server hostname, e.g., a server to serve the content . . . ."). Augme also contends that during reexamination, Yahoo! stated that the server hostname identifies "the specific location from which the digital content may be requested." Response to Office Action, Reexamination Control No. 95/001,794, at 31 (Feb. 21, 2012). Reviewing Yahoo!'s statement in its entirety, however, reveals that it was describing only an embodiment in the specification, not the claims. Yahoo! begins the discussion that Augme cites by stating: "Further, the specification of the '320 Patent expressly supports, in at least one embodiment . . . ." *Id.* at 30. Yahoo!'s discussion of an embodiment did not amount to lexicography or disavowal.

We agree with the district court's plain-meaning construction of "server hostname." We therefore affirm the

district court's entry of summary judgment that Appellants infringe the asserted claims of the '320 patent based on this construction.

## IV.  Appellants' Invalidity Challenge to Claim 7 of the '320 Patent

Finally, Appellants challenge the district court's determination that the claim 7 limitation of "receiving, by an ingest server, the unique identifier to the digital content" does not render the claim indefinite.  Appellants argue that the limitation is indefinite because the '320 patent only discloses that the ingest server receives digital content, not a unique identifier as required by the claims.  Appellants' arguments appear to be based on the wrong legal standard, i.e., written description or enablement as opposed to indefiniteness.  The standard for indefiniteness is "whether those skilled in the art would understand what is claimed when the claim is read in light of the specification."  *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).  It requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  The limitation at issue here is clear on its face and unquestionably meets this standard.  We affirm the district court's determination that claim 7 is not indefinite.

## CONCLUSION

We *affirm* the grant of summary judgment that Yahoo! does not infringe the Augme patents literally or under the doctrine of equivalents.  We *affirm* the district court's determination that claims 19 and 20 of the '691 patent are invalid for indefiniteness.  We *affirm* the grant of summary judgment that Appellants infringe the as-

serted claims of the '320 patent and the district court's conclusion that claim 7 of the '320 patent is not indefinite.

**AFFIRMED**

COSTS

No costs.